SOLOMON LEVINE AND MARILYN E. LEVINE, AS GUARDIANS AD LITEM FOR MAXWELL LEVINE, A MINOR, PLAINTIFFS-APPELLANTS, v. STATE OF NEW JERSEY DEPARTMENT OF INSTITUTIONS AND AGENCIES, COUNTY OF BERGEN, BERGEN COUNTY ADJUSTER'S OFFICE AND NORTH JERSEY TRAINING SCHOOL, DEFENDANTS-RESPONDENTS.

ROBERT G. GUEMPEL, INDIVIDUALLY AND ON BEHALF OF HIS DAUGHTER, LINDA J. GUEMPEL, A MINOR, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. STATE OF NEW JERSEY, ANN KLEIN, COMMISSIONER OF THE DEPARTMENT OF HUMAN SERVICES, THE COUNTY OF MORRIS AND HELEN BROOKS, MORRIS COUNTY ADJUSTER, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.

Argued December 10, 1979—Decided July 30, 1980.

236

*David L. Rutherford* argued the cause for appellants Solomon and Marilyn E. Levine (*Michael J. Mella*, attorney).

*Joseph E. Irenas* argued the cause for respondent and cross-appellant Robert G. Guempel (*McCarter & English*, attorneys; *Jane S. Pollack*, on the brief).

*Herbert D. Hinkle*, Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate (*Stanley C. Van Ness*, Public Advocate, attorney).

*Joseph T. Maloney*, Deputy Attorney General, argued the cause for appellants and cross-respondents State of New Jersey and *Ann Klein* in A–61/86/87 and for respondents State of New Jersey Department of Institutions and Agencies and North Jersey Training School in A–55 (*John J. Degnan*, Attorney General of New Jersey, attorney; *Stephen Skillman*, Assistant Attorney General, of counsel).

*Donald L. Berlin* argued the cause for appellants and cross-respondents County of Morris and Helen Brooks (*Lieb, Berlin & Kaplan*, attorneys).

*Kathryn A. Brock* submitted a brief on behalf of *amicus curiae* New Jersey Association for Retarded Citizens, Inc.

The opinion of the Court was delivered by

HANDLER, J.

Plaintiffs in these cases are the parents of two profoundly retarded, school-age children who reside in State institutions for the mentally retarded. These parents are responsible by statute for the costs of institutional care and maintenance provided to their individual children based upon financial ability to pay except as reduced by a small credit attributable to certain specific educational expenses. Plaintiffs contend that this credit is insufficient to cover all educational expenses actually incurred and that, notwithstanding their financial ability to pay, any charges to them for educational services provided to their children are forbidden by the "thorough and efficient" education clause of the New Jersey Constitution guaranteeing a free education to all school-age children. Plaintiffs also assert that their state and federal constitutional rights to equal protection of the laws have been violated because parents with similarly mentally retarded children able to live at home receive from the State comparable educational benefits entirely free of charge. It is further argued that they are entitled to relief under federal legislation dealing with physically and mentally disabled children, which legislation now arguably requires a state to accept full financial responsibility for the total educational expenses associated with the institutional care provided to any such children.

In the *Guempel* case, the trial court rejected the claims of the plaintiff-parent based upon the State Constitution's education clause as well as his claims, under various federal statutes. 159 *N.J.Super.* 166 (Law Div.1978). The court did find, however, that plaintiff was entitled on state and federal equal protection grounds to an educational credit equal in amount to the average per capita cost of educational benefits provided to noninstitutionalized mentally retarded children. *Id.* at 191–193. While on appeal to the Appellate Division, the case was directly certified by this Court pursuant to *R.* 2:12–1. 81 *N.J.* 279 (1979). The *Levine* case was disposed of below on summary judgment in favor of the defendants which judgment was affirmed by the Appellate Division. 160 *N.J.Super.* 591 (App.Div.1978). We

granted plaintiffs' petition for certification and that case was joined with *Guempel* for oral argument. 81 *N.J.* 270 (1979). The New Jersey Public Advocate and the New Jersey Association for Retarded Citizens, Inc. participated as *amici curiae* in this joint appeal.

I

It is important in this case to be mindful of what is *not* at issue. There is no contention made in this litigation that the quality of the residential care provided to Linda Guempel or Maxwell Levine is inadequate or that the educational services available to them are not on a par with those afforded to similarly disabled, but noninstitutionalized, children. Nor does this case present the question of whether parents without sufficient financial means to pay the institutional and related educational costs for the care of their children can nonetheless be required to do so. See *N.J.S.A.* 30:4–24(7). Rather, what is directly at issue is whether parents who do not otherwise question their moral or legal obligations to support their children and who are fully capable of paying their support can on constitutional grounds be relieved of the costs associated with their total residential care.

For reasons which are fully set forth in this opinion, we conclude on this central issue that such parents with the financial ability fully to support their children are not constitutionally entitled to require the public to assume this obligation. In reaching this conclusion, we recognize that there remain alternative non-constitutional grounds which provide opportunities for further relief under applicable statutory and administrative provisions governing the costs of educational services furnished to institutionalized school-age children.

A

An understanding of the issues presented in this appeal must commence with a full appreciation of the tragic afflictions of

each of the two children involved. Linda Guempel is a 19-year-old retarded woman who is a resident at Hunterdon State School in Clinton. According to the testimony of her father, Linda began experiencing mild seizures when she was one year old. A specialist, upon examining the infant, determined that she was mentally retarded. For a short time thereafter Linda remained at home, but, eventually her abnormal behavior and inability to be trained had adverse effects upon her family and resulted in her placement in 1965 in a residential school for the mentally impaired in Middletown, Delaware.

Linda remained at this school for five years; despite some achievements in toilet training, feeding, dressing, and rudimentary play, however, Linda's continued hyperactive and self-destructive behavior caused the school to require her withdrawal. She was then admitted to the Hunterdon State School in October 1969. At that time her IQ was estimated to be between 20 and 35; but upon a reevaluation in 1972, she was found to be profoundly retarded based on estimated cognitive functioning (IQ (Slosson) 14, Mental Age: 1 year 8 mos.) and adaptive behavior (Vineland Social Maturity Scale, Social Age: 1 year 8 mos.). A further reevaluation in 1977 showed little, if any, change in Linda's condition since 1972.

At the Hunterdon State School, the approximately 1000 residents are divided among 18 residential cottages segregated by sex and, to some extent, by degree of impairment. As does Linda, all of the residents of her particular cottage exhibit severe behavioral problems. Linda spends the major portion of her time in this cottage and in an adjacent play area. Her participation in the school's curriculum is in a program of the lowest or most basic level that emphasizes development of body awareness, sensorimotor skills and rudimentary self-care skills such as eating, toileting, grooming and dressing. The director of the school's Adaptive Learning Center explained that a large part of that curriculum is similar to that ordinarily undertaken in nursery school or kindergarten.

Maxwell Levine is even more gravely impaired than is Linda Guempel. Maxwell, a ten-year-old crib-confined child, was found in early infancy to have a "diffuse static encephalopathy relating to . . . perinatal [1] difficulties . . . associated with significant brain damage." When Maxwell was slightly more than one year old, a physician noted that he remained in "a frog position" with his hands clenched and that he exhibited no control over head movements.

In January 1974 Maxwell was admitted to the nursery unit of the North Jersey Training School at Totowa, a public institution for all levels of mentally retarded persons over five years of age. Maxwell was examined upon his admission by the school's director of pediatrics, who diagnosed the child's condition as "[c]erebral [e]ncephalopathy—[s]evere—[d]ue to cerebral anoxia" and noted that "this is a severely brain[-]damaged boy who shows no evidence of any type of awareness or development . . . [and who] will always be a permanent crib case [needing] complete care." A clinical psychologist also examined Maxwell at that time and classified him as profoundly retarded with an estimated IQ of 1. Shortly after his admission, the school's Classification Committee similarly characterized Maxwell's condition as profound mental retardation with an estimated IQ of 1, motor development at the one-month-old level, no vocalization or language skills, and an extremely low adaptive behavior rating. As of March 1979, according to reports made by the school's various service departments, Maxwell had made certain advances despite never having been scheduled as of that time for regular programming. The reports noted, for example, "that he does make sounds, follow objects, and responds to noise"; that while he "demonstrates pleasure" in response to movement, familiar faces and voices "by smiling and moving his head toward the stimulation, he is unable to follow through and complete any movement or activity upon request," and that

---

[1]"Pertaining to, occurring in, or involving the period shortly before, during, and shortly after the time of birth." 2 J. Schmid, *Attorney's Dictionary of Medicine*, at P–83 (1978).

while he "attempts to right [his] head" when he is pulled to a sitting position, "head lag" is still present.

The record contains little amplification of Maxwell Levine's daily routine at the North Jersey Training School in Totowa. It appears that while Maxwell is completely confined as a "crib case," some physical therapy and auditory reaction testing have recently begun to be administered. He remains, however, totally dependent upon "[c]omplete attendant care."

B

Since Linda and Maxwell receive care at State institutions, they both fall within the coverage of the institutional maintenance support program of Title 30 applicable to both mental institutions and mental retardation institutions. See *N.J.S.A.* 30:4–24; see generally New Jersey Legislative Office of Fiscal Affairs, *Program Analysis of Institutional Maintenance Support Payments* (1974) (hereinafter cited as *Program Analysis*). Under these provisions, the costs of maintenance of a patient in a State or county "charitable institution" (including "all necessary expenses incurred by the institution in his [or her] behalf") are to be borne primarily by the patient personally and secondarily by that patient's close relatives with sufficient financial ability to pay. *N.J.S.A.* 30:4–66. Thus, plaintiffs, as the parents of Linda and Maxwell, were required to pay at least some of the costs attributable to the residential care and maintenance of their children. These required payments form the nub of the instant controversy.

As noted, the institutionalized individual and his or her financially responsible relatives are liable for all necessary expenses incurred for the individual's maintenance. *Ibid.*; I *Program Analysis, supra* at 22. The amount actually assessed, however, is arrived at only after a multi-step process involving several governmental agencies, triggered by the admission of the individual to the institution. See *N.J.S.A.* 30:4–25.1 *et seq.* After an investigation of family and financial circumstances, the family's required monthly contribution is determined under the so-

called annual "Treasury Formula."[2] *N.J.S.A.* 30:4–34, 30:4–56, 30:4–60, 30:4–76; I *Program Analysis, supra* at 20; II *Program Analysis, supra* at 37. An institutional per capita cost figure, determined by the State House Commission, *N.J.S.A.* 30:4–78, is, in the case of school-age children, then reduced by an educational credit for certain specific educational expenses, resulting in an adjusted per capita cost figure.[3] If the monthly contribution figure based on the Treasury Formula equals or exceeds this adjusted per capita cost figure, the assessment to the individual and his or her family is limited to that adjusted per capita cost, the maximum amount assessable.[4] *N.J.S.A.* 30:4–60. Otherwise, the figure derived from the Treasury Formula becomes the amount assessed to the individual and his or her family. The difference between the adjusted per capita institutional cost and the patient's required contribution in these latter cases is then paid by the State and the individual's county of residence, with the particular allocation between those two entities determined by the individual's payment classification.[5]

---

[2]For an explanation of this formula promulgated by the Department of the Treasury and a series of tables applying it, see I *Program Analysis, supra,* Appendix B at 89 *et seq.;* see also II *Program Analysis, supra* at 38.

[3]The parties in *Guempel* stipulated that these educational costs deductible for the per capita cost of institutional care are limited to the salaries of certified teachers, their fringe benefits and the cost of certain educational supplies and equipment at the particular institution. There was also trial testimony by an official in the Department of Human Services to this same effect. 159 *N.J.Super.* at 172–173. See *post* at 266 n. 19 for the actual computation of these costs in *Guempel*. The Levines also received a comparable educational cost deduction. 160 *N.J.Super.* at 594.

[4]The State Board of Institutional Trustees, formerly the State Board of Control (*N.J.S.A.* 30:1–1), is statutorily charged with fixing the cost of maintenance of private paying patients by each institution. *N.J.S.A.* 30:4–60, 30:4–67; see *N.J.A.C.* 10:37–1.1 *et seq.* In actuality, however, this cost is pegged at the adjusted per capita cost set for each institution by the State House Commission. *N.J.S.A.* 30:4–78; see I *Program Analysis, supra* at 25. For the composition of the State House Commission, see *N.J.S.A.* 52:20–1.

[5]If the required monthly contribution is less than half of the adjusted per capita cost for the particular institution, the patient is classified as a "county indigent with contributions"; the county retains the contributions and the

The annual income of Linda Guempel's father in recent years has exceeded $100,000; as a consequence, the Guempels have been assessed the maximum adjusted per capita rate.[6] The Levines, on the other hand, have been assessed significantly less than the maximum adjusted per capita rate for the care provided to Maxwell because of their lesser ability to pay. Plaintiffs contend that the residential care provided to their institutionalized children qualifies, at least in part, as "education" within the meaning of the "thorough and efficient" education clause of the New Jersey Constitution, *N.J.Const.* (1947), Art. VIII, § 4, par. 1. Consequently, they assert initially that the statutory scheme under which they are assessed for this residential care violates the rights of their children to have a free public education as guaranteed by this constitutional provision.

## II

### A

The New Jersey Constitution, *N.J.Const.* (1947), Art. VIII, § 4, par. 1, states:

> The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.

The history of the Constitution's free public education clause is surprisingly scant. The clause became part of the State's organic law through an 1875 amendment to the school fund

---

adjusted per capita cost is divided evenly between the county and the State. If the required monthly contribution is more than one-half of the adjusted per capita cost involved, the individual is a "county excess patient"; the State retains the contributions and pays the full adjusted per capita cost to the institution. If it is determined that the patient and his relatives can contribute nothing towards the maintenance costs, the patient becomes a "county indigent with no contribution"; the county and the State each pay half of the adjusted per capita cost. I *Program Analysis, supra* at 2, 4–5, 24. Other categories also exist which are not relevant to this discussion. *Ibid.*; see *N.J.S.A.* 30:4–52.

[6]See *post* at 266 n. 19.

provision of the New Jersey Constitution of 1844.[7]  *N.J.Const.* (1844), Art. IV, § 7, par. 6 (as amended, election Sept. 7, 1875, proclamation Sept. 28, 1875).  See R. F. Butts, *Public Education in the United States: From Revolution to Reform* 173 (1978). This amendment was one of a series of recommendations made by a Constitutional Commission appointed by the governor in 1873.  Proclamation by the Governor, April 29, 1873.  See Proceedings of the 1873 New Jersey Constitutional Commission as reported in the *Trenton True American*, July 9–Nov. 18, 1873 (collected and bound).  The clause was carried over intact to our State's present 1947 Constitution, *N.J.Const.* (1947), Art. VIII, § 4, par. 1.[8]

One important theme does emerge from a review of the concededly limited history underlying this constitutional education clause in terms of its overriding purpose.  It is apparent that the framers of this clause believed a constitutional right to an education to be an essential condition of an enlightened democracy and effective representative government.  D. Murray, *History of Education in New Jersey* 29, 38 (1899); R. West, *Elementary Education in New Jersey: A History* 15–16 (1964); see also N. Burr, *Education in New Jersey 1630–1871*, at 244–258 (1942).  "The importance of education to our democratic society," as "the very foundation of good citizenship," has long been accepted as a basic tenet of American government.  *Brown v. Board of Education*, 347 *U.S.* 483, 493, 74 *S.Ct.* 686, 691, 98 *L.Ed.* 873, 880 (1954); see *Wisconsin v. Yoder*, 406 *U.S.* 205, 213, 92 *S.Ct.* 1526, 1532, 32 *L.Ed.2d* 15, 24 (1972); *Tinker v. Des Moines Community School District*, 393 *U.S.* 503, 512, 89 *S.Ct.* 733, 739–740, 21 *L.Ed.2d* 731, 741 (1969); Butts, *Public Education in*

---

[7]The Legislature had enacted a statute in 1867 creating a state board of education to supervise and control public education in the State and providing some degree of public funding.  *L.*1867, *c.* 179, amended *L.*1871, *c.* 527.  See D. Rosser, *100 Years of Free Public Education in New Jersey* (1971).

[8]Other state constitutions contain similar "thorough and efficient" provisions.  *E. g., Pa.Const.*, Art. 3, § 14.  See Comment, "*San Antonio Independent School District v. Rodriguez*: A Study of Alternatives Open to State Courts," 8 *U.S.F.L.Rev.* 90, 107 n. 113 (1973).

*the United States, supra* at 14–15, 45–46; see also Comment, "The Constitutionality of Colorado's School Finance System," 50 *U.Colo.L.Rev.* 115, 136 (1978). It has been widely acknowledged that an appropriate education for citizens is necessary to democratic self-government, *West Virginia State Bd. of Educ. v. Barnette,* 319 *U.S.* 624, 637, 63 *S.Ct.* 1178, 1185, 87 *L.Ed.* 1628, 1637 (1943), and for the full enjoyment of the rights of citizenship, *San Antonio Indep. School Dist. v. Rodriguez,* 411 *U.S.* 1, 63, 93 *S.Ct.* 1278, 1312, 36 *L.Ed.2d* 16, 60 (1973) (Brennan, J., dissenting) (there is an inextricable link between education and the rights of free speech and association and of participation in the electoral process). See generally J. Conant, *Thomas Jefferson and the Development of American Public Education* (1963).

The significance of public education in terms of citizenship and representative democracy has been recognized by the New Jersey courts on the relatively few occasions that they have been called upon to construe and explain our Constitution's education clause. In *Landis v. Ashworth,* 57 *N.J.L.* 509 (Sup.Ct. 1895), for example, the court, in rejecting a claim that a school district did not have the power to tax, addressed the education clause added to the 1844 Constitution by the 1875 amendment and observed that the fundamental purpose of that clause

> was to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording to every child such instruction as is necessary to fit it for the ordinary duties of citizenship . . . . [57 *N.J.L.* at 512.]

*Cf. Commonwealth v. Hartman,* 17 *Pa.* 118, 119–120 (Sup.Ct. 1851) (giving similar interpretation to the then-existing Pennsylvania Constitution's "education" clause, *Pa.Const.* (1838), Art. VII, § 1), cited with approval in *Trustees of Rutgers College v. Morgan,* 70 *N.J.L.* 460, 473 (Sup.Ct.1904), aff'd *per curiam* as modified 71 *N.J.L.* 663 (E. & A.1905).

More recently, in *Robinson v. Cahill,* 62 *N.J.* 473 (1973) (*Robinson I*), this Court, in the first of a series of precedent-setting

decisions [9] dealing with the constitutionality of the State's system of financing public education, held that the then-existing system of school financing was a violation of the constitutional "thorough and efficient" education clause. *Id.* at 515, 520. Chief Justice Weintraub there touched upon the essential purpose of a free public education in a democracy as embodied in that provision:

> The Constitution's ["thorough and efficient"] guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market.
>
> [*Id.* at 515.]

This ultimate goal of the constitutional education clause was also recognized and articulated by the Legislature in its enactment of the Public School Education Act of 1975. *L.*1975, *c.* 212, § 1 *et seq.*; *N.J.S.A.* 18A:7A–1 to 18A:7A–33. This act states that "[t]he goal of a thorough and efficient system of free public schools [is] to provide to all children in New Jersey, regardless of socioeconomic status or geographic location, the educational opportunity which will prepare them to function politically, economically and socially in a democratic society." *N.J.S.A.* 18A:7A–4.[10] See Note, "School Finance Reform—Judicial Com-

---

[9]This case, aptly termed a "saga" by Judge Botter in *Iuppo v. Burke,* 162 *N.J.Super.* 538, 540 (App.Div.1978), certif. den. 79 *N.J.* 462 (1978), had a long and complicated history, as its full citation in this Court alone will indicate: *Robinson v. Cahill,* 62 *N.J.* 473 (1973) (*Robinson I*) cert. den. *sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); 63 *N.J.* 196 (1973) (*Robinson II*), cert. den. *sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); 67 *N.J.* 35 (1975) (*Robinson III*); 67 *N.J.* 333 corrected opinion printed at 69 *N.J.* 133 (1975) (*Robinson IV*), cert. den. *sub nom. Klein v. Robinson,* 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.*2d 141 (1975); 69 *N.J.* 449 (1976) (*Robinson V*); 70 *N.J.* 155 (1976) (*Robinson VI*) (enjoining expenditure of funds for public schools), amended 70 *N.J.* 464 (1976), injunction vacated 70 *N.J.* 465 (1976).

[10]See generally Berke & Sinkin, "Developing a 'Thorough and Efficient' School Finance System: Alternatives for Implementing *Robinson v. Cahill,*" 3 *J.L. & Educ.* 337 (1974); Tractenberg, "Reforming School Finance Through State Constitutions: *Robinson v. Cahill* Points the Way," 27 *Rutgers L.Rev.* 365 (1974); Note, "*Robinson v. Cahill*: A Case Study in Judicial Self-Legitimization," 8 *Rut.-Cam.L.J.* 508 (1977).

pulsion of Legislative Compliance with 'Thorough and Efficient Education' Mandate," 30 *Rutgers L.Rev.* 814, 819 (1977).

There can be little doubt that the constitutional provision for public education, designed to serve the needs of an enlightened citizenry in a democratic society, was intended by its framers to be expansive in application. See *Robinson I, supra*, 62 *N.J.* at 508–509; Tractenberg, "Reforming School Finance Through State Constitutions: *Robinson v. Cahill* Points the Way," 27 *Rutgers L.Rev.* 365, 416 & n.255 (1974). The content of the Constitution's education clause is infused with the dynamism inherent in the education process itself. Thus, advances in the field of education, as well as in allied fields such as medical science and human psychology, progressively create opportunities for ever-greater numbers of children, previously impervious to instruction, to become amenable to education.[11] The constitutional education clause possesses the elasticity to envelop any such growth in the capacity and potential of children to absorb and to profit from educational endeavors. Hence, such children, as they generally become educable, also become automatically the beneficiaries of the constitutional right to a free public education. In this sense, the constitutional educational guarantee is self-executing and self-vindicating.

Given this analytic framework, the central issue in this case may now be posed more precisely, *viz.*, whether the State Constitution's free education clause, the essential purpose of which is to maximize public education so that citizens may

---

[11]It has been estimated that in 1970 approximately 3% of the general population was mentally retarded, including 2.4 million persons under 21 years of age. Of this latter number, about 1.5% (36,000) were classified as "Profound (IQ 0–20)" and 3.5% (84,000) as "Severe (IQ 20–35)"; the remainder were considered either "Moderate (IQ 36–52)" (6% or 144,000) or "Mild (IQ 53 +)" (89% or 2.1 million plus). National Association For Retarded Children, *Facts on Mental Retardation* 15 (1971), as cited in Comment, "The Handicapped Child Has a Right to an Appropriate Education," 55 *Neb.L.Rev.* 637, 638 n.2 (1976); and Comment, "Toward a Legal Theory of the Right to Education of the Mentally Retarded," 34 *Ohio St.L.J.* 554, 556 n.3 (1973); see also R. Anderson & J. Greer, *Educating the Severely and Profoundly Retarded* 7–10 (1976).

"function politically, economically and socially in a democratic society" (*N.J.S.A.* 18A:7A–4), includes within its guarantee profoundly retarded institutionalized children and the total-habilitation programs entailed in their residential care. We think not.

### B

Society has an obligation to provide for the care of mentally retarded persons. The receipt of such care has been recognized by virtually all of the states, including New Jersey, as a right in such individuals deserving of the fullest protection, with some jurisdictions predicating that right on a constitutional basis and others conferring it by statute. See Levinson, "The Right to a Minimally Adequate Education for Learning Disabled Children," 12 *Valparaiso U.L.Rev.* 253, 255 (1978) (hereinafter cited as Levinson, "Minimally Adequate Education"); Comment, "The Handicapped Child Has a Right to an Appropriate Education," 55 *Neb.L.Rev.* 637, 639 n.5 (1976) (hereinafter cited as Comment, "Handicapped Child Has a Right"); see also R. Martin, *Educating Handicapped Children: The Legal Mandate* (1979). Many courts have, therefore, on either constitutional or statutory grounds, considered the habilitation necessary in the daily care of a profoundly retarded child to be the functional equivalent of an educational right. *E. g., Wyatt v. Stickney,* 344 *F.Supp.* 373, 395 (M.D.Ala.1972), modified *sub nom. Wyatt v. Aderholt,* 503 *F.* 2d 1305 (5 Cir. 1974); see Halpern, "The Right to Habilitation," in *The Mentally Retarded Citizen and the Law* 385 (President's Committee on Mental Retardation 1976); Comment, "Handicapped Child Has a Right," *supra,* 55 *Neb.L.Rev.* at 668–672.

Indeed, the progressive and evolutionary nature of the education profession, coupled with a growing understanding of mental disabilities and improved methods for dealing with mentally retarded children, has furnished a strong basis for some courts to determine that all such children are entitled to the rights and benefits of an appropriate "education" fully equivalent to those accorded to non-mentally retarded persons. See, *e. g., Armstrong v. Kline,* 476 *F.Supp.* 583, 603–604 (E.D.Pa.1979); *Mills v. Board of Educ.,* 348 *F.Supp.* 866, 875 (D.D.C.1972); *Pennsylvania*

*Ass'n for Retarded Children (PARC) v. Pennsylvania,* 343 *F.Supp.* 279, 296, 302 (E.D.Pa.1972); *In re G. H.,* 218 *N.W.*2d 441, 446 (N.D.Sup.Ct.1974).[12]

As previously indicated, however, the State's constitutional education clause has a somewhat different focus from the care of the mentally impaired. It is designed primarily to enhance the educational opportunities of children in order to foster the educated citizenry that is indispensable to an effective democratic society. *Ante* at 245–248. Still, a great number of retarded children, including many with fairly pronounced mental and emotional impairments, have the capacity for improvement through such education and the potential thus to lead constructive social and political lives. Their education is therefore protected fully and completely by the education clause of the Constitution. Comment, "Handicapped Child Has a Right," *supra,* 55 *Neb.L.Rev.* at 637 n.2.

■ Nevertheless, the sad fact endures that there is a category of mentally disabled children so severely impaired as to be unable to absorb or benefit from education. It is neither realistic nor meaningful to equate the type of care and habilitation which such children require for their health and survival with "education" in the sense that that term is used in the constitution. *Cf. Department of Mental Hygiene v. Dolan,* 89 *Misc.*2d 1003, 1006, 392 *N.Y.S.*2d 980, 984 (Civ.Ct.1977) ("[e]fforts

[12]Many commentators have also taken this position. See, *e. g.,* Dimond, "The Constitutional Right to Education: The Quiet Revolution," 24 *Hastings L.J.* 1087, 1088, 1097–1098, 1105–1106 (1973) (see also discussion of *PARC* and *Mills* cases at 1116–1118); Gilhool, "Education: An Inalienable Right," 39 *Exceptional Children* 597, 603 (1973); Handel, "The Role of the Advocate in Securing the Handicapped Child's Right to an Effective Minimal Education," 36 *Ohio St.L.J.* 349, 357, 365 (1975); Levinson, "The Right to a Minimally Adequate Education for Learning Disabled Children," 12 *Valparaiso U.L.Rev.* 253, 255, 261 (1978); McClung, "Do Handicapped Children Have a Legal Right to a Minimally Adequate Education?," 3 *J. Law & Educ.* 153 (1974); P. Wald, "The Right to Education," in 2 *Legal Rights of the Mentally Handicapped* 831 (1973); Comment, "Handicapped Child Has a Right," *supra* note 11, 55 *Neb.L.Rev.* at 647–648, 661–662; see generally Symposium, "The Legal Rights of the Mentally Retarded," 23 *Syracuse L.Rev.* 991 (1972).

to develop the capacities of a mentally retarded child to the fullest extent possible may be education in the philosophical sense but it is not education in the legislative sense"). The constitutional mandate for a free public education simply does not apply to these unfortunate children. See *Armstrong v. Kline, supra*, 476 *F.Supp.* at 590–592, 600; *Cuyahoga County Ass'n for Retarded Children & Adults v. Essex*, 411 *F.Supp.* 46, 52 (N.D.Ohio 1976) (upholding Ohio's educational statutes excluding from the system of free public schools those mentally retarded children found "incapable of profiting substantially from further instruction"); *Dep't of Public Welfare v. Haas*, 15 *Ill.2d* 204, 213, 154 *N.E.2d* 265, 270 (Sup.Ct.1958) ("While this constitutional guarantee [to free public education] applies to all children in the State, it cannot assure that all children are educable. The term 'common school education' implies the capacity, as well as the right, to receive common training, otherwise the educational process cannot function."); *In re the "A" Family*, 602 *P.2d* 157, 163 (Mont.Sup.Ct.1979); Haggerty & Sacks "Education of the Handicapped: Towards a Definition of an Appropriate Education," 50 *Temple L.Q.* 961, 983 n.125 (1977); Handel, "The Role of the Advocate," *supra*, 36 *Ohio St.L.J.* at 355; Note, "Legal Remedies for the Misclassification or Wrongful Placement of Educationally Handicapped Children," 14 *Colum.J.L. & Soc.Problems* 389, 393–394, 407 (1979); Comment, "Toward a Legal Theory of the Right to Education of the Mentally Retarded," 34 *Ohio St.L.J.* 554, 555–558, 568–569, 571–575 (1973) (hereinafter cited as Comment, "Toward a Legal Theory").

Concededly, it is difficult to differentiate those mentally retarded children minimally capable of absorbing education and, hence, constitutionally entitled to an appropriate education, from those children so impaired that they cannot be educated at all, in the constitutional sense. Nevertheless, this complex definitional task has been essayed and workable guidelines have been formulated to assist in the classification of those mentally impaired children who are constitutionally entitled to a free

public education. See, e. g., *Armstrong v. Kline, supra,* 476 *F.Supp.* at 587–588.[13]

For present purposes, the Public School Education Act of 1975, *L.*1975, *c.* 212, *N.J.S.A.* 18A:7A–1 *et seq.,* can serve as the primary exemplar of such standards. That act attempts a comprehensive categorization of mentally-handicapped children, *viz* :

> Each child classified pursuant to section 18A:46–8 [14] as mentally retarded shall be similarly further identified, examined and classified into one of the following subcategories:
>
> a. *Educable mentally retarded children,* who are those who may be expected to succeed with a minimum of supervision in homes and schools and community life and are characterized particularly by reasonable expectation that at maturity they will be capable of vocational and social independence in competitive environment[s];
>
> b. *Trainable mentally retarded children,* who are so retarded that they cannot be classified as educable but are, notwithstanding, potentially capable of selfhelp, of communicating satisfactorily, or participating in groups, of directing their behavior so as not to be dangerous to themselves or others and of achieving with training some degree of personal independence and social and economic usefulness within sheltered environments . . .. [*N.J.S.A.* 18A:46–9 (emphases added).]

As for the children falling into these two categories of mental retardation, their entitlement to a free thorough and efficient public education under our State Constitution is clear, aside from any statutory rights to such an education. Thus, those children referred to in the statute as "educable" enjoy a "reasonable expectation that at maturity they will be capable of

---

[13]In *Armstrong v. Kline,* 476 *F.Supp.* 583, 587–588 (E.D.Pa.1979), the court recognized degrees of mental retardation, including as one class the "severely and profoundly impaired" and found that there can be differences in the education programs from child to child "in light of the nature and severity of the [particular] child's handicapping condition." See also Comment, "Handicapped Child Has a Right," *supra* note 11, 55 *Neb.L.Rev.* at 637 n.2 ("[t]he terms 'mild,' 'moderate,' 'severe' and 'profound' . . . describe levels of mental retardation, determined by considering both 'measured intelligence' and 'impairment in adaptive behavior' "); *ante* at 248 n.11 see generally American Ass'n on Mental Deficiency, *Manual on Terminology and Classification in Mental Retardation* (1977 Rev.).

[14]*N.J.S.A.* 18A:46–8 provides that each child identified as "handicapped" under *N.J.S.A.* 18A:46–6 shall be examined and presumptively classified according to the type of handicap present.

vocational and social independence in [a] competitive environment." *N.J.S.A.* 18A:46–9(a). The education of such youngsters obviously fulfills the beneficent purpose of the constitutional education clause. *Cf. Robinson I, supra,* 62 *N.J.* at 515 (the purpose of education is "to equip a child for his role as a citizen and as a competitor in the labor market"); *Landis v. Ashworth, supra,* 57 *N.J.L.* at 512 (the purpose of education is "to fit [a child] for the ordinary duties of citizenship"); *N.J.S.A.* 18A:7A–4 (the purpose of education is "[to] prepare [children] to function politically, economically and socially in a democratic society").

The constitutional goal of fostering an effective citizenry through education is served by also including "trainable" children within the ambit of the Constitution's education clause. These children are "potentially capable of self-help . . . and of achieving with training some degree of personal independence and social and economic usefulness," albeit only "within sheltered environments." *N.J.S.A.* 18A:46–9(b).

The statute further deals with children who are "subtrainable" (with a maximum overall IQ level of 24), *i. e.,* those whose mental deficiencies do not bring them even to the level of "trainable mentally retarded children" (*N.J.S.A.* 18A:46–9(b)). *N.J.A.C.* 10:44–10.3(b)(5); see *N.J.A.C.* 10:46–2.3(a)(2).

> [These "subtrainable" children] are . . . so severely mentally retarded as to be incapable of giving evidence of understanding and responding in a positive manner to simple directions expressed in the child's primary mode of communication and who cannot in some manner express basic wants and needs. [*N.J.S.A.* 18A:46–9(c).] [15]

These "subtrainable" children, by definition, have no capacity for even the minimal levels of performance or achievement which the thorough and efficient education clause of the State Constitution addresses. Hence, apart from the humanitarian and compassionate instincts which naturally impel society to concentrate public resources and governmental attention upon these unfortunate, most gravely impaired children, the State

---

[15]The statute denominates these noneducable and nontrainable children as "eligible for day training." *N.J.S.A.* 18A:46–9(c).

Constitution does not through its education clause make this moral commitment.

Plaintiffs and *amici* stress, however, that despite these differences between profoundly mentally retarded children and those retarded children capable of education or training, a "thorough and efficient" education includes one appropriate to the minimal capacities of all such children and is clearly required to be provided by state statutory law. Plaintiffs on this basis argue that they are entitled to complete financial relief under the current educational statutes and that these laws possess constitutional force because they are coextensive with the constitutional mandate of a thorough and efficient system of free public schools. The short rejoinder to this argument, however, is that it fails to recognize that the Legislature can grant, and in the enactment of *L.*1975, *c.* 212 actually has accorded, educational rights that go beyond basic constitutional requirements. See *Trustees of Rutgers College v. Morgan, supra,* 70 *N.J.L.* at 471–472; *Landis v. Ashworth, supra,* 57 *N.J.L.* at 512; see also *Lullo v. International Ass'n of Fire Fighters Local 1066,* 55 *N.J.* 409, 414–415, 420–421 (1970).

In sum, the children involved in this appeal, Linda Guempel and Maxwell Levine, according to the record, fall within the mentally retarded statutory group of "subtrainable" children set forth in *N.J.S.A.* 18A:46–9(c). They are "so severely mentally retarded as to be incapable of giving evidence of understanding and responding in a positive manner to simple directions expressed in the child's primary mode of communication and [to be unable to] in some manner express basic wants and needs." *Ibid.* Their best interests, in light of their grave afflictions, require that they be institutionalized in order to receive constant and complete habilitation. While such total residential care secondarily includes services minimally analogous to formal instruction more typical of schools and educational institutions, these children are not capable either of receiving or of benefitting from any additional instruction or education as such. Consequently, the residential care which they require for their day-to-day well-being, including the minimal incidental instruc-

tion involved, does not qualify as "education" within the meaning of the education clause of the New Jersey Constitution, *N.J.Const.* (1947), Art. VIII, § 4, par. 1. Accordingly, plaintiffs, as the parents of these children, are not constitutionally entitled to have the institutional care of their children furnished free of charge at public expense. Their claims for such reimbursement predicated directly upon the education clause of the New Jersey Constitution must therefore be rejected.

### III

Plaintiffs next assert that the costs of the institutional care of their children imposed upon them under the State statutory scheme violate their rights to equal protection under the federal and State Constitutions. The trial court in the *Guempel* case held on state and federal equal protection grounds that residents of state schools must be given a deduction against their per capita costs in an amount equal to the average per capita sum spent for those noninstitutionalized mentally retarded children enrolled in the day care center program. 159 *N.J.Super.* at 191–192. The court based this holding upon a belief that both "institutions" have a similar custodial purpose and that both serve similar groups of children; it found "something constitutionally invidious" in allowing the nonresidential child the equivalent of $5,500 worth of educational services while giving an institutionalized child an educational expense credit of only $309.68. *Id.* at 190–191.

The Appellate Division in the *Levine* case specifically disapproved of the trial court's holding in *Guempel* that parents of school-age children residing in state facilities are entitled on equal protection grounds to a credit equal to the average annual per capita cost of day training. 160 *N.J.Super.* at 595–596. The appellate court first reasoned that there exist "sufficient significant differences and distinctions" between children in day training and those in residential facilities to warrant separate classifications and disparate treatment. *Id.* at 596. In the case of residential services, the State, by providing for all of the child's needs 24 hours of every day, 365 days a year, "acts in the place

of the parents"; in contrast, parents of day training students "are themselves providing all of such needs to the child, with the exception of the educational services supplied by the day care center." *Ibid.* The court concluded that these differences, when coupled with the greater cost to the State of residential services, justified the assessment of per capita costs to parents of institutionalized children while no such costs are imposed upon those parents of noninstitutionalized children. *Ibid.*

"The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed." *Washington National Insurance Co. v. Board of Review*, 1 *N.J.* 545, 553 (1949); *accord, Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55, 79 (1978). Stated differently, "[e]qual protection is the guarantee that similar people will be dealt with in a similar manner and that people of different circumstances will not be treated as if they were the same." J. Nowak, R. Rotunda & J. N. Young, *Constitutional Law* 520 (1978) (footnote omitted); see Tussman and tenBroek, "The Equal Protection of the Laws," 37 *Calif.L. Rev.* 341, 344 (1949). While this "constitutional requirement of equal protection is met by legislation which treats in a like or similar manner all persons within a class reasonably selected," *Mason v. Civil Service Comm'n*, 51 *N.J.* 115, 128 (1968), it does not prohibit all statutory differentiation, *McKenney v. Byrne*, 82 *N.J.* 304, 316 (1980) ("some discriminatory impact and some imperfections in the groupings or categories will not invalidate the classification"); *Trap Rock Industries, Inc. v. Kohl*, 63 *N.J.* 1, 5 (1973), *cert.* den. 414 *U.S.* 860, 94 *S.Ct.* 74, 38 *L.Ed.*2d 110 (1973). See *Idaho Dep't of Employment v. Smith*, 434 *U.S.* 100, 101, 98 *S.Ct.* 327, 328, 54 *L.Ed.*2d 324, 327 (1977). Thus, a court, when presented with such a question, "must first determine what burden of justification the [particular] classification . . . must meet, by looking to the nature of the classification and the individual interests affected." *Memorial Hospital v. Maricopa*

*County*, 415 *U.S.* 250, 253, 94 *S.Ct.* 1076, 1080, 39 *L.Ed.*2d 306, 312 (1974) (footnote omitted).

■ This Court has noted that under the conventional analysis of equal protection claims, "the burden is on the party attacking the classification to show that it lacks a rational relationship to a legitimate state objective. The notable exception to this test occurs in situations where the classification involves 'suspect' criteria or impinges upon 'fundamental' rights. In these cases the burden is on the state to show that the classification serves a 'compelling state interest.'" *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 80 *N.J.* 6, 37–38 (1976); *accord, State v. Senno*, 79 *N.J.* 216, 225 (1979); *Robbiani v. Burke*, 77 *N.J.* 383, 391–392 (1978); *State v. Krol*, 68 *N.J.* 236, 253 (1975); see *San Antonio Indep. School Dist. v. Rodriguez, supra*, 411 *U.S.* at 17, 93 *S.Ct.* at 1288, 36 *L.Ed.*2d at 33. Equal protection is implicitly guaranteed by our State Constitution. *N.J.Const.* (1947), Art. I, par. 1; see *McKenney v. Byrne, supra*, 82 *N.J.* at 316; *Peper v. Princeton University Bd. of Trustees, supra*, 77 *N.J.* at 79. This Court has frequently recognized that the approach called for by a challenge to a state statute upon state equal protection grounds parallels that used under the federal Constitution. *McKenney v. Byrne, supra*, 82 *N.J.* at 316–317; see *Vornado, Inc. v. Hyland*, 77 *N.J.* 347, 352–354 (1978), app.dism. *sub nom. Vornado, Inc. v. Degnan*, 439 *U.S.* 1123, 99 *S.Ct.* 1037, 59 *L.Ed.*2d 84 (1979); *Tomarchio v. Township of Greenwich*, 75 *N.J.* 62, 69; *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra*, 80 *N.J.* at 37–44. Thus, for the "strict scrutiny" or "compelling state interest" test to be applicable here, it must be shown either that profoundly mentally impaired children constitute a suspect classification or that their habilitation, including incidental education, is, or implicates, a fundamental right. If one of these two showings is made, this more exacting equal protection test will come into play rather than the rational relationship test. See *Velmohos v. Maren Engineering Corp.*, 83 *N.J.* 282, 294 (1980); *cf. Matthews v. Atlantic City*, 84 *N.J.* 153, 169–170 (1980) (restrictions upon right to run for municipal office affect the right to vote and are therefore subject to greater scrutiny).

To the extent that habilitation for the profoundly retarded is equated with an "appropriate education," *ante* at 249–255, is such an education a "fundamental right"? This Court has stated that "[t]he only rights which are 'fundamental' in this regard are those expressly guaranteed or clearly implied by the federal constitution." *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* 80 *N.J.* at 38; *accord, State v. Senno, supra,* 79 *N.J.* at 226. The United States Supreme Court has expressly rejected the position that education is such a fundamental right. *San Antonio Indep. School Dist. v. Rodriquez, supra,* 411 *U.S.* at 35, 93 *S.Ct.* at 1297–1298, 36 *L.Ed.2d* at 44 ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."); see *Nowak et al., supra* at 684–686; but see Levinson, "Minimally Adequate Education," *supra,* 12 *Valparaiso U.L.Rev.* at 261 n.41; Wald, "The Right to Education," *supra* at 835–837.

As for our own New Jersey Constitution, the right to a free public education is there expressly guaranteed, *N.J.Const.* (1947), Art. VIII, § 4, par. 1, and, thus, as defined by this Court (*ante* at 244–249), does constitute a fundamental right. The habilitation efforts required in the care of statutorily subtrainable, profoundly impaired children (*N.J.S.A.* 18A:46–9(c)), however, are not included within this constitutional guarantee and, thus, are not components of that fundamental right. *Ante* at 254–255. Thus, the particular services here in question do not constitute a fundamental right for either state or federal equal protection purposes.

The issue remaining is whether the classification here involves a suspect criterion. See *State v. Senno, supra,* 79 *N.J.* at 226–227 (quoting from *San Antonio Indep. School Dist. v. Rodriguez, supra,* 411 *U.S.* at 28, 93 *S.Ct.* at 1294, 36 *L.Ed.2d* at 40, and *Frontiero v. Richardson,* 411 *U.S.* 677, 686, 93 *S.Ct.* 1764, 1770, 36 *L.Ed.2d* 583, 591 (1973) (plurality opinion)); *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* 80 *N.J.* at 38–39 n.15.

In some contexts, persons afflicted with mental impairments might appear to qualify in a constitutional sense as a "suspect class." See *State v. Senno, supra,* 79 *N.J.* at 226–227; Burgdorf & Burgdorf, "A History of Unequal Treatment: The Qualifications of Handicapped Persons as a 'Suspect Class' under the Equal Protection Clause," 15 *Santa Clara Law.* 855, 915 *et seq.* (1975); *cf.* Burt, "Beyond the Right to Habilitation," in *The Mentally Retarded Citizen and the Law, supra* at 425 (mental retardation as a "semisuspect classification"); L. Tribe, *American Constitutional Law* 1080 n.17 (1978) (same). The constitutional comparison in this case, however, relates to *all* school-age children who because of their profound mental retardation constitute a class—the statutorily subtrainable (*N.J.S.A.* 18A:46–9(c)). The narrow question for equal protection purposes, therefore, is whether as among statutorily subtrainable, school-age children, a differentiation of such children based solely upon the circumstance of institutionalization serves to render such a classification "suspect." We conclude that it does not.

Professionals in this field have recognized that mentally impaired persons sharing many characteristics may be classified into "subgroups" in terms of their level of retardation. National Association for Retarded Children, *Facts on Mental Retardation* 4 (1971), cited in Comment, "Handicapped Child Has a Right," *supra,* 55 *Neb.L.Rev.* at 637–638 n.2, and Comment "Toward a Legal Theory," *supra,* 34 *Ohio St.L.J.* at 555–556; see *Armstrong v. Kline, supra,* 476 *F.Supp.* at 588–589; see also *ante* at 248 & n.11, 252–254. "[A]lthough the mentally retarded as a class share many characteristics, each level presents its own special problems and needs, and each demands some specific response by society." Comment, "Toward a Legal Theory," *supra,* 34 *Ohio St.L.J.* at 556. Obviously, the difference between the two categories within the class under consideration here—institutionalized profoundly retarded and noninstitutionalized profoundly retarded—turns upon the need for, and the fact of, total 24-hour-per-day professional habilitation. And, as the record here reveals, the relevant factors dictating institutionalization as the means for such habilitation are not spurious,

illusory or capricious; they have to do with the child's mental capacity and behavioral characteristics. See also *N.J.S.A.* 30:4–24. These are real and objective criteria which underlie the classification of such children. Since the equal protection analysis requires a focus upon the purpose and "nature of the classification and the individual interests affected," *Memorial Hospital v. Maricopa County, supra,* 415 *U.S.* at 253, 94 *S.Ct.* at 1080, 39 *L.Ed.*2d at 312, we are entirely satisfied that the classification here is not a suspect one.

There is a clear distinction between the educational services incidentally included as a constituent part of the total habilitation required for the institutionalized subtrainable children and those which are made available to the subtrainable children at day care centers. Even though profoundly retarded children who are institutionalized receive "educational" services analogous to those received by nonresidential, day-care-training children, the education available to the former is strictly subordinate to and functionally integrated with the child's total 24-hour-per-day habilitation.[16]  For example, in this case Linda Guempel spends most of her time in her cottage and play area; her only contact with the school's curriculum consists of attempting to develop minimal self-care skills, *e. g.,* eating and dressing. And Maxwell Levine, totally crib-confined, undergoes only brief physical therapy and auditory reaction testing. See Halpern, "The Right to Habilitation," *supra* at 394–395; *cf.* Burt, "Beyond the Right to Habilitation," *id.* at 417, 419. The lower court in the *Guempel* case correctly characterized the functions of such residential institutions as "in the area of care, custody and safekeeping"; education is there only of secondary significance, 159 *N.J.Super.* at 188, 190. That finding is consist-

---

[16]In a sense, this difference is reflected statutorily. The Developmentally Disabled Rights Act, *L.*1977. *c.* 82. *N.J.S.A.* 30:6D–1 *et seq.*, for example, requires that every developmentally disabled person between the ages of 5 and 21 in residence or full-time attendance at any public or private facility shall be provided "a thorough and efficient education suited to such person's age and abilities." *N.J.S.A.* 30:6D–5(c). "Education" as such, however, is only one of the many health and social services specified to be furnished for the developmentally disabled. *N.J.S.A.* 30:6D–3(b).

ent with the decision of the Appellate Division in the *Levine* case. 160 *N.J.Super.* at 596.

■ Since education and its functional relationship to the total care of a profoundly retarded, institutionalized child necessarily differ from that which may otherwise be available to a nonresidential child, the question that remains is whether there is a rational relationship between the differential funding of educational services for institutionalized children and the overall objectives of state policy dealing with profoundly retarded children. One of the critical and paramount goals of the complex of statutory educational programs addressed to children is for them to become responsible and effectively functioning adults. *N.J. S.A.* 18A:7A–4. This goal applies equally to those children who, though mentally retarded, are capable of benefiting from an education. *Ibid.*; see also *N.J.S.A.* 30:6D–1 *et seq.*; State Facilities Education Act of 1979, *L.*1979, *c.* 207 (*N.J.S.A.* 18A:– 7B–1 *et seq.*).

This commendable objective has been translated into providing such handicapped children with a statutory right to receive their care through the "least restrictive alternatives." See Martin, *Educating Handicapped Children, supra* at 28, 57 *et seq.*; Abeson, Bolick & Hass, "A Primer on Due Process: Education Decisions for Handicapped Children," 42 *Exceptional Children* 68, 69 (1975); Haggerty & Sacks, "Education of the Handicapped," *supra*, 50 *Temple L.Q.* at 972; Note, "Enforcing the Right to an 'Appropriate' Education: The Education for All Handicapped Children Act of 1975," 92 *Harv.L.Rev.* 1103, 1118 (1979); Comment, "Handicapped Child Has a Right," *supra*, 55 *Neb.L.Rev.* at 672–673; Comment, "Toward a Legal Theory," *supra*, 34 *Ohio St.L.J.* at 574–575.[17] Courts have also endorsed

---

[17]The right to treatment through the "least restrictive alternatives," which includes, of course, alternatives to institutional care, has been the subject of wide commentary. *E. g.*, Chambers, "Right to the Least Restrictive Alternative Setting for Treatment," in 2 *Legal Rights of the Mentally Handicapped* 991 (1973); Ferleger & Boyd, "Anti-Institutionalization: The Promise of the *Pennhurst* Case," 31 *Stan.L.Rev.* 717 (1979); Spece, "Preserving the Right to Treatment: A Critical Assessment and Constructive Development of Consti-

this educational philosophy under the rubric of "mainstreaming," that is, encouraging to the greatest extent possible a life of normality for profoundly retarded children. See *Halderman v. Pennhurst State School & Hospital*, 612 *F.*2d 84, 114–115 (3 Cir. 1979), *cert.* granted 447 *U.S.* 904, 100 *S.Ct.* 2984, 64 *L.Ed.*2d 853 (1980);[18] *Rowley v. Board of Educ.*, 483 *F.Supp.* 528, 533 (S.D.N.Y.1980), aff'd 632 *F.*2d 945 (2 Cir. 1980); *Hairston v. Drosick*, 423 *F.Supp.* 180, 184–185 (S.D.W.Va.1976); *In re the "A" Family, supra*, 602 *P.*2d at 163.

Although we recognize that plaintiffs may be entitled to statutory relief with respect to their claims of fiscal discrimination (see Point IV, *post* at 263–268), the asserted disparate or differential funding of educational services furnished to profoundly retarded institutionalized children vis-á-vis those not institutionalized can be related rationally to the broad goals or policies serving to upgrade the quality of life for disabled children. Where the State itself provides the bulk of the child's care, *i. e.*, habilitation and residential facilities, the parents may reasonably be required to reimburse the State to a far greater extent than in instances in which the parents are themselves directly fulfilling their parental caretaking obligations. This is wholly consistent with and gives effect to the unquestioned moral obligation of parents to pay for the care of their children. *State v. LeVien*, 44 *N.J.* 323, 330–331 (1965); see also *Department of Mental Hygiene v. Dolan, supra*, 89 *Misc.*2d at 1006–1008, 392 *N.Y.S.*2d at 984–985; *In re Levy*, 38 *N.Y.*2d 653, 662, 345 *N.E.*2d 556, 560, 382 *N.Y.S.*2d 13, 17 (Ct.App.1976), app.

---

tutional Right to Treatment Theories," 20 *Ariz.L.Rev.* 1 (1978); Note, "Legal Remedies for the Misclassification or Wrongful Placement of Educationally Handicapped Children," 14 *Colum.J.L. & Social Problems* 389 (1979).

[18]Many of the issues currently before this Court in the instant case are now before the United States Supreme Court in *Halderman* and its companion cases, although those cases deal primarily with the Developmentally Disabled Assistance and Bill of Rights Act, 42 *U.S.C.A.* § 6000 *et seq. Certiorari* was granted in those cases on June 9, 1980. See also Ferleger & Boyd, "Anti-Institutionalization: The Promise of the *Pennhurst* Case," 31 *Stan.L.Rev.* 717 (1979).

dism. 429 *U.S.* 805, 97 *S.Ct.* 39, 50 *L.Ed.*2d 66 (1976). Moreover, such differentiation is not here applied unfairly or harshly since the statutory scheme challenged by plaintiffs takes into account their financial ability to pay. *N.J.S.A.* 30:4–60, 30:4–66; see *ante* at 242–244. More important, this funding scheme encourages "mainstreaming" in its broadest sense. It provides a financial disincentive to parents who place their children in residential institutions; conversely, it helps those parents of profoundly retarded children who make the sacrifices entailed in keeping their children at home thereby enabling such children to lead a fuller life. *Cf. Ridgely v. Secretary of Dep't of Health, Education & Welfare,* 345 *F.Supp.* 983, 993 (D.Md.1972), aff'd 475 *F.*2d 1222 (4 Cir. 1973) (portions of Medicare statute providing similar disincentives in favor of caring for the elderly at home); see generally Ewing, "Health Planning and Deinstitutionalization: Advocacy Within the Administrative Process," 31 *Stan.L.Rev.* 679 (1979).

As the parents of institutionalized children, the plaintiffs' equal protection grievance focuses upon their payment for educational services which are provided without charge to similarly afflicted children who live at home with their own families. We conclude, for the reasons set forth, that this grievance does not equate with discriminatory treatment on a constitutional plane. Plaintiffs have not been subjected to unequal protection of the laws by the requirement to pay in accordance with their financial ability a substantial portion of the costs of the total residential care, inclusive of educational services, that is provided to their profoundly retarded institutionalized children.

## IV

A final issue, raised in the *Guempel* case but equally applicable to *Levine,* concerns plaintiffs' entitlement to remedial relief under federal law. See generally Schwartz, "Federal Rights of Handicapped Children," 182 (116) *N.Y.L.J.* 1 (1979). Because of the interrelationship of the pertinent federal statutes, the Rehabilitation Act of 1973, 29 *U.S.C.A.* §§ 701–794 (1975) (as amended by Rehabilitation, Comprehensive Services, and Developmen-

tal Disabilities Amendments of 1978, *Pub.L.* 95–602, titles I–IV, 92 *Stat.* 2955–3003) [hereinafter referred to as Rehabilitation Act] and the Education for All Handicapped Children Act of 1975, 20 *U.S.C.A.* §§ 1401–1461 (1978) (*Pub.L.* 94–142, 89 *Stat.* 773 (1975)) [hereinafter referred to as the Handicapped Children Act], and the State statutory and administrative scheme, this issue necessarily implicates the threshold question of whether plaintiffs are entitled to greater financial aid from the State under the applicable *state* laws.

■ It is not clear from the record in this case whether the educational credits accorded plaintiffs in fact comply with the above-described complex statutory scheme governing the costs of institutionalization of mentally retarded children. Because of both the inadequacy of the record on this point and the factual and legal complexity of this issue, we deem it necessary to remand the cases for appropriate administrative proceedings in order to determine the precise amount that should be allowed as a credit for education and associated services under pertinent statutory law to parents of institutionalized, profoundly retarded school-age children. The outcome of such administrative proceedings will undoubtedly affect plaintiffs' federal claims. Determination of those claims at this juncture, therefore, would be premature.

The State Department of Education has promulgated a set of regulations designed to implement the broad goals of special education pursuant to *N.J.S.A.* 18A:46–1 *et seq.* and 18A:46A–1 *et seq.* See *N.J.A.C.* 6:28–1.1 *et seq.* These regulations incorporate, as well, the goals and standards of the Federal Handicapped Children Act. The term "free appropriate education," as used in those regulations, is defined so as to encompass both *special education* and *related services* which are provided "at public expense . . . and without charge to parents and guardians, . . . [which] meet the standards established by the State Department of Education, . . . [and which conform to] the pupil's individualized education program . . ." *N.J.A.C.* 6:28–1.2. Additionally, the State Public School Education tion Act of 1975 (*N.J.S.A.* 18A:7A–1 *et seq.*) also directs the

appropriate State or local education agency to promulgate educational standards and curricula designed to meet the needs of the entire student population. *N.J.S.A.* 18A:7A–6, 18A:7A–7. Such standards reflect the broad array of "related services" included in the definition of a "free appropriate education." *N.J.A.C.* 6:28–1.2. Thus, pursuant to *N.J.A.C.* 6:28–10.5(d), the Division of Mental Retardation in the Department of Human Services is required to provide commensurate education programs and services to severely and profoundly retarded children in State residential institutions as well as to noninstitutionalized children enrolled in day training centers.

In addition to the Public School Education Act of 1975, the educational needs of institutionalized retarded children are specifically the concern of other recently enacted legislation. The Developmentally Disabled Rights Act, *N.J.S.A.* 30:6D–1 *et seq.* (*L.*1977, *c.* 82), requires specifically that such institutionalized profoundly retarded children shall be provided "a thorough and efficient education suited to such person's age and abilities." *N.J.S.A.* 30:6D–5(c). Similar requirements are also contained in the State Facilities Education Act of 1979, *N.J.S.A.* 18A:7B–1 *et seq.* (*L.*1979, *c.* 207); see Committee Statement, *L.*1979, *c.* 207. Reflecting in some measure this complex and comprehensive statutory scheme to provide for the educational and related needs of mentally impaired children, the parties in *Guempel* stipulated and the trial judge found that the educational programs and services provided to both institutionalized and noninstitutionalized profoundly retarded children are substantially similar. *Guempel, supra,* 159 *N.J.Super.* at 190–191; see also *Levine, supra,* 160 *N.J.Super.* at 596.

Despite such statutory provisions requiring appropriate educational treatment for the mentally impaired, however, it does not appear that the administrative scheme currently used to compute the basic per capita costs of institutional care at State institutions, including particularly the education deduction, was designed to ensure compliance with the statutorily-prescribed components of a thorough and efficient education. This present computation system was apparently initiated in 1918 (*L.*1918, *c.*

147; *N.J.S.A.* 30:4–49 *et seq.*) and was specifically designed to determine per capita residential costs for persons of all ages in every public charitable institution, correctional facility and public hospital and then to allocate responsibility for those costs among the State, the county of residence, and the individual. See *ante* at 242–243. It was not particularly attuned or responsive to the requirements of school-age retarded children, including their educational needs. Moreover, with respect to the State-operated system of day care training centers, the Department of Human Services (then the Department of Institutions and Agencies) has borne the entire cost of such facilities and programs from their inception, patterning the system on the local public school model. See *N.J.S.A.* 18A:46–18.1, 30:4–165.2. Nevertheless, while the day training centers do provide similar services, it does not appear that the costs of these services can be facilely applied to State institutions; nor does it appear that the accounting practices for the computation of costs as initially adopted under Title 30 for application to institutionalized children can be adapted so as to include the full range of services provided without charge to parents of day training pupils, services which institutionalized children are now statutorily entitled to receive.[19]  *N.J.S.A.* 30:6D–5(c), 30:6D–9.

---

[19]The computation of the cost of institutionalized care involves the use of certain accounting assumptions which include some but not all of the total education and associated services furnished to residential retarded children. *Ante* at 243 n.3. The parties stipulated in the *Guempel* case to the following cost figures for the Hunterdon State School:

|  | Basic Per Capita Cost | Per Capita Education Adjustment | Adjusted Per Capita Cost |
|---|---|---|---|
| 1972 | $ 7,666.55 | $171.81 | $ 7,594.74 |
| 1973 | 8,506.75 | 178.19 | 8,328.56 |
| 1974 | 9,934.38 | 212.43 | 9,721.95 |
| 1975 | 10,170.67 | 218.33 | 9,952.34 |
| 1976 | 10,699.45 | 370.40 | 10,329.05 |
| 1977 | 11,397.19 | 332.47 | 11,064.72 |
| 1978 | 12,704.99 | 309.68 | 12,395.31 |

See 159 *N.J.Super.* at 173. The trial court, in considering the adequacy of

■ All of these questions embrace a very complex subject matter which is most appropriately the concern of governmental specialists. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562–563 (1978); *In re William B. Kessler Memorial Hospital*, 78 *N.J.* 564, 577–579 (1979) (Handler, J., concurring); see *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 *U.S.* 645, 654, 93 *S.Ct.* 2488, 2494, 37 *L.Ed.2d* 235, 242 (1973); *Parisi v. Davidson*, 405 *U.S.* 34, 37–38, 92 *S.Ct.* 815, 817–818, 31 *L.Ed.2d* 17, 25 (1972). Consequently, there should here be a remand of these cases to the appropriate administrative agency so that plaintiffs' entitlement to adequate monetary relief from the cost of care and habilitation may be considered in depth with the requisite administrative expertise. *Paterson Redevelopment Agency v. Schulman*, 78 *N.J.* 378, 386–387 (1979), *cert.* den. 444 *U.S.* 900, 100 *S.Ct.* 210, 62 *L.Ed.2d* 136 (1979); *Roadway Express, Inc. v. Kingsley*, 37 *N.J.* 136, 140–142 (1962). To the extent that these matters span the concerns of several governmental agencies or bodies (*i. e.*, Department of Education, Department of Human Services, Department of the Treasury, State House Commission), it may be anticipated that an orderly procedure before the most appropriate tribunal will be undertaken. *N.J.S.A.* 52:14F–1 *et seq.* (Office of Administrative Law); *N.J.A.C.* 19:65–14.1 through 19:65–14.8 at 12 *N.J.R.* 362–376 (1980); see *Hackensack v. Winner*, 82 *N.J.* 1, 36–38 (1980); *Hinfey v. Matawan Regional Board of Educ.*, 77 *N.J.* 514, 531–533 (1978). Moreover, insofar as the questions to be resolved require special understanding and insights for their correct resolution, our administrative processes contemplate that persons suitably qualified by expertise, experience and compe-

---

the educational credit available to the Guempels, a total of $309.68 in 1978, concluded that equivalent annual educational services provided to nonresidential children at day care training centers were worth $5,500. *Id.* at 191. The State points out, however, that other funding sources have not been taken into account and that the fiscal comparison is therefore not accurate. A determination of the precise value of the free services received by day care training students as well as their application to institutionalized children would here require further inquiry and findings of fact.

tence will determine these issues, at least in the first instance. *Hackensack v. Winner, supra,* 82 *N.J.* at 37–38.[20]

Accordingly, the judgments below are modified and the matters are remanded for resolution consistent with this opinion.

PASHMAN, J., dissenting.

Today the majority brands a group of children as uneducable and unfit citizens because it mistakenly believes the Legislature has done so. By its unquestioning deference to an imagined legislative intention, the majority has completely abdicated its fundamental responsibility of constitutional judicial review. The majority leaves these children to the dubious protection of what it calls "humanitarian and compassionate instincts," see

---

[20]A remand for administrative agency proceedings would address some federal concerns. Both the Rehabilitation Act and Handicapped Children Act provide that parents are entitled to a due process hearing to resolve disputes on "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 *U.S.C.A.* § 1415(b)(1)(E) (1978); see Note, "Administrative Rights of Handicapped Children to Educational Opportunities: Recent Developments in New York Law," 14 *Colum.J.L. & Social Problems* 491, 518 *et seq.* (1974); see also *Stemple v. Prince George's County Bd. of Educ.,* 623 *F.2d* 893 (4 Cir. 1980); 45 *C.F.R.* § 84.36 (1979) (due process procedural safeguards under the Rehabilitation Act). After the present suits were instituted, the State Department of Education established a procedure to comply with these federal due process requirements. *N.J.A.C.* 6:28–1.9

Such an administrative proceeding at this point would obviate a decision as to whether the federal statutes provide a private cause of action. It may be noted on this point, however, that at least with respect to § 504 of the Rehabilitation Act, 29 *U.S.C.A.* § 794 (1975) (as amended by Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, *Pub.L.* 95–602, §§ 119, 122, 92 *Stat.* 2955, 2982), most courts which have ruled on this question have found that a private right of action exists thereunder. See, *e. g., Camenisch v. University of Texas,* 616 *F.2d* 127, 130–131 (5 Cir. 1980); *Leary v. Crapsey,* 566 *F.2d* 863, 865 (2 Cir. 1977); *United Handicapped Federation v. Andre,* 558 *F.2d* 413, 415 (8 Cir. 1977); *Poole v. South Plainfield Board of Educ.,* 490 *F.Supp.* 948, 949 (D.N.J.1980); see also Note, "Accommodating the Handicapped: Rehabilitation Section 504 After *Southeastern,*" 80 *Colum.L.Rev.* 171 (1980). *Cf. Maine v. Thiboutot,* —— *U.S.* ——, —— 100 *S.Ct.* 2502, 2504, 65 *L.Ed.2d* 555, —— (1980) (42 *U.S.C.A.* § 1983 creates a statutory right of action against state officers for violation of federal statutory rights or entitlements).

*ante* at 253 and what others would call political expediency. This result diminishes more than our State Constitution's guarantee of education. It diminishes the meaning of our common humanity, for it is by education that each of us, including Linda Guempel and Maxwell Levine, attains the full measure of the humanity we possess. I therefore dissent.

## I

As its initial and most egregious error, the majority examines our State Constitution's sweeping guarantee of a "thorough and efficient" education, *N.J.Const.* (1947) Art. VIII, § 4, par. 1,[1] and concludes that the words "all the children in the State between the ages of five and eighteen years," *id.*, refers to all children who are not profoundly mentally impaired. See *ante* at 249. By limiting the reach of the thorough and efficient education clause, the majority relegates that guarantee to a subordinate position among the fundamental rights safeguarded by our State Constitution. It has also effectively abdicated this Court's ultimate responsibility for ensuring that the Legislature fulfills its constitutionally mandated obligations.

## A

I share wholeheartedly in the majority's recognition of the essential role education plays in "an enlightened democracy and effective representative government." See *ante* at 245. The necessity of an appropriate education to the exercise of the rights of self-government cannot be denied and should not be underestimated. See, *e. g., Brown v. Board of Education*, 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873 (1954). *Robinson v. Cahill*, 62 *N.J.* 473 (1973) (*"Robinson I"*), cert. den. *sub nom. Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973).

---

[1]The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction *of all the children in the State* between the ages of five and eighteen years. [*N.J.Const.* (1947) Art. VIII, § 4, par. 1 (emphasis added)]

Thus, if education were not a fundamental right under our State Constitution, I might be persuaded to afford it some constitutional status because of the indirect effect it has on the franchise. *Cf. Matthews v. City of Atlantic City*, 84 *N.J.* 153 (1980). To say, however, that the right to education necessarily depends upon the ability to exercise the franchise is to deny education its fundamental status. The same is true concerning the majority's attempt to subordinate the right to education to the right to compete in the labor market. See *ante* at 247. On this frivolous theory, those who neither vote nor work may be required to reimburse the State for the cost of their public education. This apparent absurdity is the majority's result today. Since neither Linda Guempel nor Maxwell Levine will ever be able to vote or work, the State may constitutionally require reimbursement for the cost of their training.

As essential to the needs of our system of government as education is, its constitutional significance does not end there. In concluding that it does, the majority has misplaced its reliance on federal precedent. Since there is no federally guaranteed right to education, see *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 *U.S.* 1, 93 *S.Ct.* 1278, 36 *L.Ed.*2d 16 (1973), any federal constitutional interest in education arises solely as a complement to other basic tenets of federal organic law. See *id.* at 62–63, 93 *S.Ct.* at 1311–1312, 36 *L.Ed.*2d at 60 (Brennan, J., dissenting). Under our State Constitution, however, the right to education enjoys coequal status with other fundamental rights. Its purpose and meaning must therefore be assessed in a manner befitting its independent, fundamental nature.

Reciting the few references courts have made to the demands of the education clause cannot substitute for a necessarily searching inquiry into the meaning of education as a fundamental right. Neither *Landis v. Ashworth*, 57 *N.J.L.* 509 (Sup.Ct. 1895), nor *Robinson I, supra*, dealt with the question of entitlement that now confronts this court. The court in *Landis* was concerned with whether school districts were political subdivi-

sions of the State, thus possessing the power to tax. Local taxation was assailed on the grounds that it resulted "in affording different degrees of instruction to the children in different districts, while it is the duty of the legislature to see that the same facilities for education are furnished to every child in the state." 57 *N.J.L.* at 512. The court concluded that the amount of local funding above the State appropriation went beyond the minimum required by the Constitution. This obligation was seen as "a duty of providing for a thorough and efficient system of free schools, capable of affording to every child such instruction as is necessary to fit it for the ordinary duties of citizenship * * *." *Id.* The Legislature could delegate authority to local entities to provide further instruction in "non-essential" areas without violation of its constitutional obligations. However, the court had no occasion to consider whether this constitutional minimum encompassed more basic skills for the ordinary needs of survival.

In *Robinson I* this Court was again concerned with the State's delegation of its responsibility to finance public education to local governments. Excessive reliance on property taxes had resulted in gross disparities in school funding. The Court declined to accept the "unlikely proposition that the lowest level of dollar performance happens to coincide with the constitutional mandate" while all other school districts supply more than the constitutional minimum. 62 *N.J.* at 516. Part of the basis for this view was our recognition that providing solely an elementary school education could no longer pass constitutional muster. 62 *N.J.* at 515. The Court refused to treat a "thorough and efficient education" as a stagnant concept, frozen in meaning since an education clause was included in our Constitution of 1875. We emphasized that "[t]he Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting * * *." *Id.* We did not, however, consider whether that guarantee embraced more basic skills than those necessary "to equip a child for his role as a citizen and as a competitor in the labor market." *Id.*

The vast majority of this State's children attend local, conventional public schools.[2] This is the class of children with which *Landis* and *Robinson I* were concerned. The majority is unmindful of the focus of these decisions. It superimposes selected quotations from them on the present controversy without realizing that they examined only the rights of children whose educational needs were met by conventional schooling. In this case of first impression, the issue before us concerns the rights of those unfortunate children whose educational needs are *not* met by local schools that inculcate the virtues of citizenship and competition. Despite any limiting constitutional language, the majority erects a barrier to a free, thorough and efficient education that Linda Guempel and Maxwell Levine will never be able to pass. According to the majority, not only must a child be "between the ages of five and eighteen," *N.J.Const.* (1947) Art. VIII, § 4, par. 1, he must be inherently capable of becoming an intelligent voter or an active competitor for wealth, status and power—the currencies of success in our economic order. Although Linda Guempel and Maxwell Levine will undoubtedly never vote, although they undoubtedly will never attain any wealth, power or social prestige, I believe, contrary to the majority, that the State Constitution guarantees to them an education.

The majority's attempt to characterize its interpretation of the education clause as "self-vindicating," see *ante* at 248 is unpersuasive. As a means for giving substance to a fundamental right, I view it rather as self-defeating. The majority's approach ties the constitutional concept of "education" to a legislative definition of "educable." To determine which children are not constitutionally entitled to an education, the majority exclusively relies on the stated "purpose" of education in *N.J.S.A.* 18A:7A–4 and the Legislature's classification of men-

---

[2] According to reported enrollment statistics on file with the Department of Education, as of September 28, 1979 there were 1,299,988 children attending public schools; 202,268 children attending private and parochial schools; and 4,027 school-age children in state facilities.

tally impaired children as "educable," "trainable" or "eligible for day training," [3] *N.J.S.A.* 18A:46–9. This is judicial abdication. This Court rejected the temptation in *Robinson I* when it refused to accept the definition of an education inherent in a minimal level of local school funding. See 62 *N.J.* at 516; *supra* at 239–240. Today it has succumbed.

Allowing the Legislature—and by extension the Executive branch—to be the ultimate arbiters of constitutional values poses an evident danger to the children of this State. Political pressures can understandably cause officials who are accountable to the electoral process to ignore the pleas of their constitutional conscience. The permanence of any statutory or regulatory determination of who is entitled to a free education is illusory. This is the justification for constitutional judicial review.

> There are others to give strong voice against violence to person and property, to proclaim social needs and to promote economic welfare. But there are few to deplore the deprivation of an individual's liberty, and none other so clothed in the moral traditions of the rule of law. [*State v. Sugar*, 84 *N.J.* 1, at 12 (1980)].

In New Jersey, a free education is one of a child's fundamental rights, part of our State Constitution's conception of ordered liberty. The ultimate responsibility for ensuring legislative and executive compliance with this constitutional mandate is reposed with this Court. See *Robinson v. Cahill*, 69 *N.J.* 133, 147 (1975) ("*Robinson IV*"), *cert. den. sub nom. Klein v. Robinson*, 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.2d* 141 (1975); *Cooper v. Nutley Sun Printing Co., Inc.*, 36 *N.J.* 189, 196 (1961); *Asbury Park Press, Inc. v. Woolley*, 33 *N.J.* 1, 12 (1960); see also *Marbury v. Madison*, 5 *U.S.* (1 Cranch) 137, 164, 176–180, 2 *L.Ed.* 60, 69, 73–74 (1803). "However delicate"—or in this case, difficult, see *ante* at 252 —"that duty may be, we are not at liberty to

---

[3] The majority repeatedly employs the term "subtrainable" for this third class of children, see, *e. g., ante* at 253, 254 & 258 but this is not the Legislature's categorization. In fact, by amendment in 1975 the Legislature eliminated the words "neither educable nor trainable" from the description of the category. See *L.*1975, *c.* 212, § 39.

surrender, or ignore, or to waive it." *Asbury Park Press, supra,* 33 *N.J.* at 12. The majority has done just that.

There are other reasons why the majority's reliance on the categories of educability in *N.J.S.A.* 18A:46–9 is deficient. First, these categories were not intended to distinguish between children capable and incapable of benefitting from educational services. In the same statute the Legislature has provided for educational services for children in all these categories. See *N.J.S.A.* 18A:46–13, –18.1. It is no answer to say that the Legislature can grant educational rights that go beyond constitutional requirements. See *ante* at 254. Under the majority's interpretation, the Legislature has provided for large expenditures of time, effort and resources to afford educational services to children completely incapable of benefitting from them. I do not believe the Legislature intended such a wasteful endeavor.

Second, although the majority has phrased the question before it as "whether the State Constitution's free education clause * * * includes within its guarantee profoundly retarded institutionalized children," see *ante* at 249, its use of the "eligible for day training" category to describe those children it considers uneducable denies the protection of the Constitution to children who are not institutionalized. All mentally impaired children classified as "eligible for day training" are now placed on the far side of a great divide. The consequences of misclassification are enormous, for the Legislature may at any time cut educational services to this class. The majority's approach has turned a constitutional right into an arbitrary matter. Under present regulations one I.Q. point separates those "eligible for day training" from those "trainable" individuals who are entitled to a free education. See *N.J.A.C.* 10:44–10.3(b)(5). Those who can score at least 25 on a designated I.Q. test are "children" for purposes of the Constitution. According to the majority, those who score up to 24 are something less. Although there are acknowledged difficulties in obtaining a reliable, quantitative assessment of intellectual ability, see *e.g.*, O. Kolstoe, *Mental Retardation: An Educational Viewpoint* 35 (1972); G. Blair, *Educational Psychology* 470 (ed ed. 1968), the majority sees no

problem in drawing a thin, bright constitutional line with an "intelligence" test.

I have no quarrel with the majority that the education which children like Linda Guempel and Maxwell Levine can absorb is, even at their present ages, far less than that of the mentally average five-year-old. Nevertheless, I cannot accept a definition of education which does not provide to each child the training and assistance necessary to function as best they can in whatever will be their environment—even if that environment will be insulated from the world of politics and economic competition.[4] The ability of even profoundly impaired children to benefit from education is universally acknowledged. See *e.g.*, President's Committee on Mental Retardation, *Report to the President* 8, 20 (1976); H. Switzky, *et al.* "The Developmental Model & Its Implications for Assessment & Instruction for the Severely/Profoundly Handicapped," 17 *Mental Retardation* 167, 168 (1979). "[T]hese unfortunate children," see *ante* at 251, are entitled to more than our compassion. The rudimentary level of their education does not render it unworthy of constitutional protection. We cannot ignore the intellect a child possesses because he possesses so little. We cannot deny him the protection of our laws because there is almost nothing to protect.

"To me a meaningful opportunity to learn is the birthright of every New Jerseyan." *Robbiani v. Burke*, 77 *N.J.* 383, 402 (1978) (Pashman, J., dissenting). The differences in the capacity to benefit from education among mentally impaired children are assuredly differences in degree. But because of their shared humanity, they cannot be considered differences in kind. I would therefore hold that "all children in the State between the ages of five and eighteen years," regardless of the level of their intelligence, are constitutionally entitled to a free education. *N.J.Const.* (1947) Art. VIII, § 4, par. 1.

---

[4] By including the "educable" and "trainable" categories within the reach of the education guarantee even if they are institutionalized, see *ante* at 251–253, the majority concedes that a restricted environment does not preclude a constitutional entitlement to education.

B

The inquiry does not end with the recognition of a constitutional right to a free education. The elements of that entitlement must still be assessed. As noted, I agree with the majority's recognition of differing capacities among mentally impaired children; I also join in the Court's acknowledgement of the dynamic nature of education. See *ante* at 248. Unlike the majority, however, I believe these factors determine the content of the educational services required, not whether any services are guaranteed. Thus plaintiffs and *amici* are correct in asserting not that mentally impaired children are entitled to the same education, but rather that every impaired child is entitled to an education appropriate to his abilities.

It is the initial responsibility of the Legislature to establish standards for the educational services the State must provide. See *Robinson IV*, 69 *N.J.* at 160 (Pashman, J., concurring and dissenting). The Legislature and those agencies to which it properly delegates authority "have broad discretion in defining those standards." *Id.* Courts should generally respect the exercise of this discretion because they have "no special expertise in matters of educational policy * * *." *Id.* In the Public School Education Act of 1975, *L.* 1975, *c.* 212, the Legislature has set out the elements of a thorough and efficient education. These are:

a. Establishment of educational goals at both the State and local levels;

b. Encouragement of public involvement in the establishment of educational goals;

c. Instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills;

d. A breadth of program offerings designed to develop the individual talents and abilities of pupils;

e. Programs and supportive services for all pupils especially those who are educationally disadvantaged or who have special educational needs;

f. Adequately equipped, sanitary and secure physical facilities and adequate materials and supplies;

g. Qualified instructional and other personnel;

h. Efficient administrative procedures;

i. An adequate State program of research and development; and

j. Evaluation and monitoring programs at both the State and local levels.

[*N.J.S.A.* 18A:7A–5]

This act also amended *N.J.S.A.* 18A:46–9, the statutory provision governing the classification of mentally impaired children. *L.* 1975, *c.* 212, § 39. As amended, that provision establishes three categories for such children: "educable," "trainable," and "eligible for day training." *Id.* According to the act, "educable" and "trainable" children who are mentally impaired must receive "suitable facilities and programs of education" from local boards of education. *N.J.S.A.* 18A:46–13. For children classified as "eligible for day training," it is the "duty of the State board [of education] in concert with the Department of Institutions and Agencies [now the Department of Human Resources, see *L.* 1976, *c.* 98, *N.J.S.A.* 30:1A–1] to provide suitable facilities and programs * * *." *L.* 1975, *c.* 212, § 43, *N.J.S.A.* 18A:46–18.1. As amended by *L.* 1979, *c.* 207, § 16 (effective July 1, 1980), *N.J.S.A.* 18A:46–18.1, the Department must also provide transportation for children attending day training centers. Any doubt that the Legislature intended all three groups to receive a thorough and efficient education is resolved by the Developmentally Disabled Rights Act, *L.* 1977, *c.* 82, *N.J.S.A.* 30:6D–1 *et seq.* Section 5(c) of the act, *N.J.S.A.* 30:6D–5(c), provides that every disabled person—including every mentally impaired person, *N.J.S.A.* 30:6D–3(a)(1)(a)—between the ages of 5 and 21 who is in residence or full time attendance at any public or private facility shall be provided "a thorough and efficient education suited to such person's age and abilities." See also "The State Facilities Education Act of 1979," *L.*1979, *c.* 207, § 9, *N.J.S.A.* 18A:7B–5. The majority is alone in declaring certain mentally impaired children to be uneducable, for it is clear the Legislature has not done so.

The facial validity of the Public School Education Act was determined in *Robinson v. Cahill*, 69 *N.J.* 449 (1976) ("*Robinson V*"). Plaintiffs here do not claim that their children are not receiving an appropriately thorough and efficient education. We therefore need not determine whether the services provided by the State in fact fall short of that necessary to develop the capabilities of the mentally impaired to function in their expect-

ed future environment. The question before us is whether the State must provide such an education free of charge. I conclude that the allowance of a $310 education deduction from the cost of maintenance of school-aged children in residential institutions does not amount to the provision of a free education.

Currently the deduction itself reflects only the salaries and fringe benefits for certified teachers and teaching supervisors, the cost of educational supplies and the servicing, repair and replacement of educational equipment.[5] In seeking to sustain this method of computation, the State argues that no other services provided in residential facilities can be classified as education. It relies on the definition of "services" contained in the Developmentally Disabled Rights Act:

> "Services" or "services for persons with developmental disabilities" means specialized services or special adaptations of generic services provided by any public or private agency, organization or institution and directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with such a disability; and such term includes diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, training, education, sheltered employment, recreation, counseling of the individual with such disability and of his family, protective and other social and socio-legal services, information and referral services, followalong services, and transportation services necessary to assure delivery of services to persons with developmental disabilities * * * [*N.J.S.A.* 30:6D–3(b)].

According to the State, since education is listed separately as only one element of "services," it cannot be thought to include any of the other enumerated services.

This contention must be rejected for two reasons. First, the focus of the Developmentally Disabled Rights Act is directed at providing complete habilitation services to persons of all ages, not merely those of school age. Its purpose was to ensure that the fundamental rights of the developmentally disabled were not relinquished by

---

[5]As the majority notes, this deduction procedure is not mandated by *N.J.S.A.* 30:4–66, which permits charges for "maintenance" based on ability to pay. The calculations for education are entirely an administrative matter. See *ante* at 242–243.

admission to any facility or receipt of any service for developmentally disabled persons[.] * * * [S]ervices which are offered to the developmentally disabled shall be provided in a manner which respects the dignity, individuality and constitutional, civil and legal rights of each developmentally disabled person * * *. [*N.J.S.A.* 30:6D-2]

Thus, while the definitions of "services," *N.J.S.A.* 30:6D-3(b), and facilities, *id.* at 30:6D-3(c), describe the full scope of the statute's intended reach, they cannot be read to circumscribe the content of an appropriate education required by the State Constitution.

The second reason is that the State's position is diametrically contrary to the mandate of *N.J.S.A.* 18A:7A-5 (quoted *supra* at 276). That provision clearly requires services other than those performed by certified teachers as part of a "thorough and efficient" education. See also *N.J.A.C.* 6:8-4.3 (staffing requirements of State Department of Education); New Jersey Department of Institutions and Agencies, Division of Mental Retardation, *Standards for Public Institutions* §§ 1.7.2.3, 4.2.5 (1973).

The State also points to the State Facilities Education Act of 1979, *L.*1979, *c.* 207, *N.J.S.A.* 18A:7B-1 *et seq.*, as evidence that its limited educational deduction is appropriate. This argument is equally unpersuasive. According to the act's legislative history, it is primarily a financing statute aimed at ensuring adequate funding to comply with the Public School Education Act and the federal Education for All Handicapped Children Act, 20 *U.S.C.A.* § 1401 *et seq.* See *Senate Education Committee Statement to Assembly No. 86* (1979). It sets up a new scheme for paying the costs of educating children in residential facilities. Included within the services covered by the statute are classes in State facilities such as the Hunterdon State School and the North Jersey Training School, where Linda Guempel and Maxwell Levine, respectively, now reside. Section 6 of the act provides for direct payment of federal and state funds for children in such facilities to the State Department of Human Services rather than the local school district. *N.J.S.A.* 18A:7B-2. Section 8 provides as follows:

Funds received pursuant to this act by the Department of Human Services or by the Department of Corrections shall be used only for the salaries of teachers, educational administrators at the program level, child study team personnel, and

paraprofessionals assigned to educational programs in State facilities, and for the costs of educational materials and supplies for these programs. No such funds shall be used for the renovation or construction of capital facilities, for the maintenance and operation of educational facilities, or for custodial, habilitation or other noneducational costs. [*N.J.S.A.* 18A:7B–4]

Two observations are in order. First, the State's new accounting arrangement does not define or describe the content of a free and appropriately "thorough and efficient" education in State facilities. Such a reading would conflict with the Public School Education Act, which requires among other things adequate physical facilities. See *N.J.S.A.* 18A:7A–5(f); 18A:46–18.-1. Second, even if one were to assume that the statute specified the elements of a "thorough and efficient" education, the educational items listed in section 8 include many more services than those which form the basis for the $310 deduction.

If the present method of computing the cost which can be charged for residential, custodial care excludes only those items set out, *supra* at 278, it clearly violates the constitutional guarantee of a free education. The State asserts, however, that the $310 education credit does not represent the full amount of services supplied free of charge. This is because several types of expenses, including all those covered by federal grants, are not included in figuring the per capita costs of education and custodial care.

On the present record, it is impossible to determine the extent of any overcharge to the parents of Linda Guempel and Maxwell Levine.[6] I therefore agree with the majority that both cases should be remanded for detailed administrative findings as to whether the institutions have charged for educational services which must, under the State Constitution and *N.J.S.A.* 18A:7A–5, be provided free.

## II

The majority further errs by rejecting plaintiffs' claims that they have been denied equal protection of the laws. Even

---

[6]The fact that the Levines were not required to pay the full per capita cost of "maintenance" will be relevant in determining whether they in fact paid for any educational services.

assuming that none of the services provided Linda Guempel and Maxwell Levine are constitutionally required, charging institutionalized children for some of the same services which are provided free of charge at day training centers constitutes a violation of federal and State equal protection guarantees, *U.S. Const.*Amend. XIV; *N.J.Const.* (1947) Art. I, pars. 1, 5.

The majority has determined, erroneously in my view, that the educational services received by Linda Guempel and Maxwell Levine are within the legislative prerogative. Even if this constitutional judgment were correct, it would not necessarily lead to the application of minimal judicial scrutiny under principles of equal protection.[7] A more exacting standard of review is required when a legislative classification is based on a "suspect class." As we observed in *Taxpayer's Ass'n of Weymouth Tp. v. Weymouth Tp.*, 80 *N.J.* 6 (1976), app. dism. and *cert.* den. *sub nom. Feldman v. Weymouth Tp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977):

> The label "suspect" attaches to the criteria for legislative classification which pose an exceptional danger of misuse to unfairly burdened classes of persons who share "immutable characteristics determined solely by accident of birth," *Frontiero v. Richardson*, 411 *U.S.* 677, 686, 93 *S.Ct.* 1764, 1770, 36 *L.Ed.*2d 583, 591 (1973); or who are otherwise "saddled with such disabilities, or subjected to such a history of unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process," *San Antonio Independent School Dist. v. Rodriguez, supra*, 411 *U.S.* at 28, 93 *S.Ct.* at 1294, 36 *L.Ed.*2d at 40; *see generally, Johnson v. Robinson*, 415 *U.S.* 361, 375 n.14, 94 *S.Ct.* 1160, 39 *L.Ed.*2d 389, 402–403 n.14 (1974). [80 *N.J.* at 38 n.15.]

See *State v. Senno*, 79 *N.J.* 216, 226–227 (1979). While mental impairment is not necessarily congenital, it is a natural disability which historically has been accompanied by discriminatory treatment and political powerlessness. See Burgdorf & Burgdorf, "A History of Unequal Treatment: The Qualifications of Handicapped Persons as a 'Suspect Class' under the Equal Protection

---

[7] I assume that the majority has concluded, contrary to State Board regulations, *N.J.A.C.* 10:28–10.5(d), that even *as a matter of legislative prerog*ative the same free education need not be provided to all eligible for day training children. Otherwise, plaintiffs would be statutorily entitled to all educational services without cost, and the equal protection question would not arise.

Clause," 15 *Santa Clara Law.* 855, 915 (1975); see also L. Tribe, *American Constitutional Law,* 1081 n.17 (1978). Recognizing this, the majority acknowledges that "persons afflicted with mental impairments might appear to qualify in a constitutional sense as a 'suspect class.'" *Ante* at 259. See *In re D. H.,* 218 *N.W.*2d 441, 446–447 (Sup.Ct.N.D. 1974). Yet the majority ignores this appearance and discounts entirely the presence of suspect criteria in the classification employed by the State. According to the majority, the classification in question is based "*solely* upon the circumstance of institutionalization * * *." *Ante* at 259 (emphasis added). The fact that only some of the handicapped children are involved does not eliminate the inherently suspect character of the classification. Discrimination against racial minorities, for example, would be no less invidious if confined to blacks over six feet tall. *Cf. Reitman v. Mulkey,* 387 *U.S.* 369, 87 *S.Ct.* 1627, 18 *L.Ed.*2d 830 (1967). Here the fact of institutionalization alone does not have any probative value as to the educability of a handicapped child. The level of intelligence—which the majority considers the indicator of educational capacity—is the same for all children who are "eligible for day training." The use of "institutionalization" to determine the level of entitlement superimposes a facially neutral, but irrelevant, criteria on top of an otherwise discriminatory scheme. The accompanying use of legitimate criteria may partially conceal invidious discrimination, but it cannot justify it.

The conclusion that the classification here delineates a constitutionally "suspect class" would trigger strict judicial scrutiny. See, *e.g., Robinson I,* 62 *N.J.* at 491 (adopting federal approach to suspect classes); see also *Salorio v. Glaser,* 82 *N.J.* 482 (1980), appeal docketed 49 *U.S.L.W.* 3005 (U.S. June 23, 1980) (No. 79–2026). No compelling interest has been advanced by the State for providing fewer subsidized educational services to "eligible for day training" children who are institutionalized. Nor would the present scheme pass constitutional muster if the nature of the classification called for an intermediate standard of review. See, *e.g., Craig v. Boren,* 429 *U.S.* 190, 97 *S.Ct.* 451, 50 *L.Ed.*2d 397 (1976); *Matthews v. City of Atlantic City, supra.*

Even if the Legislature's scheme for providing educational services did not involve an invidious classification, a stricter standard of review would be required because of the importance of what the Legislature has withheld from Linda Guempel and Maxwell Levine. The majority commits serious error in its assessment of the constitutional significance of education. The Court is correct in noting that the right to a free education is not a "fundamental" right for purposes of the federal equal protection clause, *San Antonio Indep. Sch. Dist. v. Rodriguez, supra.* However, the majority has completely disregarded our own precedents in blindly applying the entire federal approach as the appropriate analysis under our State Constitution. As Chief Justice Weintraub explained in *Robinson I* :

> [W]e have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez,* that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. [62 *N.J.* at 491]

These words have not lost their validity. This court has only recently reaffirmed this analysis. *Taxpayer's Ass'n of Weymouth Tp. v. Weymouth Tp., supra.*

These cases exemplify a more flexible approach to this type of equal protection analysis. Although the assumption underlying this discussion is that the educational services in question are strictly a matter of legislative prerogative, minimal scrutiny is not therefore appropriate.[8] In concluding that it is, the majority has "glossed over the sliding scale approach which [*Robinson I*] and *Weymouth* mandate for the scrutiny of statutory classifications which impinge upon basic personal rights." *Robbiani v. Burke, supra,* 77 *N.J.* at 399 (Pashman, J., dissenting).

> Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbi-

---

[8]Considered as a governmental service which is *not* constitutionally guaranteed, the "compelling state interest" test should not be applied. See *Robinson I, supra,* 62 *N.J.* at 496 (rejecting notion that "if the State decides that a service shall be furnished, the service should thereby become one of 'fundamental right.' "). *Cf. Dandridge v. Williams,* 397 *U.S.* 471, 485, 90 *S.Ct.* 1153, 1161, 25 *L.Ed.2d* 491, 502 (1970).

> trary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. [*Robinson I, supra,* 62 *N.J.* at 492]
>
> Thus, where an important personal right is affected by governmental action, this Court often requires the public authority to demonstrate a greater "public need" than is traditionally required in construing the federal constitution. Specifically, it must be shown that there is an "appropriate governmental interest suitably furthered by the differential treatment." [*Weymouth, supra,* 80 *N.J.* at 43 (citation omitted)]

The majority inexplicably rejects recent decisions of this Court and links State equal protection guarantee to federal standards. The majority's approach is particularly ill-advised in view of the increasing and widely acknowledged dissatisfaction with the rigid "two-tier" analysis. See *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 *U.S.* 173, 188–189, 99 *S.Ct.* 983, 992–993, 59 *L.Ed.*2d 230, 244 (1979) (Blackmun, J., concurring); *Craig v. Boren,* 429 *U.S.* 190, 210–211 n.*, 97 *S.Ct.* 451, 463–464 n.*, 50 *L.Ed.*2d 397, 415 n.* (1976) (Powell, J., concurring); *id.* at 211–212, 97 S.Ct. at 464–465, 50 *L.Ed.*2d at 415–416 (Stevens, J., concurring); *Dandridge v. Williams,* 397 *U.S.* 471, 519–521, 90 *S.Ct.* 1153, 1178–1180, 25 *L.Ed.*2d 491 (1970) (Marshall, J., dissenting). See also *Matthews v. City of Atlantic City, supra* ; Gunther, "The Supreme Court 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection," 86 *Harv.L.Rev.* 1 (1972).

There is no question that education is an important personal right. It is of even greater importance to the mentally impaired who rely on education for instruction in the most basic of personal tasks. In my view, this fact necessitates greater governmental justification than some hypothesized rationale or a piecemeal approach. The State's classification must be reasonably necessary to an important State objective. See *Matthews v. City of Atlantic City, supra,* 84 *N.J.* at 169.

Linda Guempel and Maxwell Levine have been denied the free education afforded their peers because they are institutionalized—not because they are uneducable. Under intermediate constitutional scrutiny, the State's classification must fail for want of justification. Since the State presently provides educational services at private expense, it cannot claim that it denies

a free education because of the inherent difficulties in training institutionalized children. According to the Developmentally Disabled Rights Act and section 39 of the Public School Education Act, there are no differences in the educational services the State shall provide, whether at public or private expense, to children who are institutionalized and those who are not. See *supra* at 276–278. Thus, the State's only justification for refusing to pay for institutionalized education on an equal basis is a desire to conserve funds by granting educational subsidies "one step at a time." This Court has rejected such a rationale when applying intermediate judicial scrutiny to the denial of important personal rights. See *Matthews v. City of Atlantic City, supra,* 84 *N.J.* at 173. The result should be no different here.

Even under the minimal judicial scrutiny employed by the majority, the present unequal provision of educational services violates federal and State guarantees. There is simply no rational relation between the fact of institutionalization and the denial of subsidies for the educational services provided. The majority's statement that "[t]here is a clear distinction between the educational services" provided institutionalized children and "those which are made available to the subtrainable children at day care centers," *ante* at 260–261, is in flagrant and inexplicable disregard of the parties' stipulations, the trial court findings in *Guempel* and State Department of Education regulations, see *N.J.A.C.* 6:28–10.5(d). The services provided are substantially the same. The fact that the hours during which these services are provided may not be the same does not in any way support charging for some and not for others.

Nor does the concept of "mainstreaming," the benefits of which are so amply documented by the majority, *ante* at 261–262; see *N.J.A.C.* 6:28–2.2, support such disparate funding of educational services to similarly impaired individuals. The obligation to provide the least restricted educational environment rests with the State, not parents. I cannot conceive of allowing the State to charge parents of institutionalized children for educational services as a legitimate means to "encourage" ful-

fillment of its own obligation to "mainstream." [9] Finally, requiring parents of institutionalized children to pay for educational services does not in any way give "effect to the unquestioned moral obligation of parents to pay for the care of their children," *ante* at 262. Only a requirement that parents pay for their child's custodial care—which parents of children outside institutions provide at home—would be supported by such a rationale.

On grounds of equal protection, I would therefore require reimbursement to the parents for any charges for services provided free in day training centers. Unless the State can show that the provision of these same services in institutions costs less, they should be presumed to have a value of $5,500 per year—the amount stipulated by the parties as representing the value of day training services.

### III

The majority concludes that the need for a remand renders unnecessary any discussion of plaintiffs' federal statutory claims, since these will be resolved at the administrative level. I believe the following comments are warranted to guide the proceedings. Under federal regulations promulgated by the United States Department of Health, Education and Welfare pursuant to Section 504 of the Rehabilitation Act of 1973, 29 *U.S.C.A.* § 794,

> [i]f placement in a * * * residential program is necessary to provide a free appropriate education to a handicapped person because of his or her handicap, the program, including non-medical care and room and board, shall be provided at no cost to the person or his or her parents or guardian. [45 *C.F.R.* § 84.33(c)(3)] [10]

---

[9] The majority states that it is the parents who "place their children in residential institutions." *Ante* at 263. This is inaccurate. That decision is made by the State. *N.J.A.C.* 10:46–1.1 *et seq.*

[10] Since these regulations became effective on June 3, 1977, any charge for these items since that date would have been impermissible. The Education for All Handicapped Children Act has a similar provision, 20 *U.S.C.A.*

Parents may be required to pay for room and board only "[w]hen residential care is necessitated *not* by the student's handicap but by factors such as the student's home conditions * * *." 45 *C.F.R.*, Part 84, Appendix A at 23 (emphasis added).

Because plaintiffs' children were placed in residential facilities prior to the promulgation of these federal standards, the present record does not indicate whether the reasons for their continued placement fall within the standards. I agree with the interpretation advanced by the Public Advocate as *amicus*, which requires public financing of the entire cost of residential placement whenever placement in a less restrictive environment is not possible. See 20 *U.S.C.A.* § 1412(5)(B); *N.J.A.C.* 6:28–2.2.

Contrary to the view of the trial court in the *Guempel* case, the State's responsibility to finance residential placement under federal law is not limited to those placements which are "incidental to an educational program * * *." 159 *N.J.Super.* at 185. Many factors may combine to require placement. While "[i]t may be possible in some situations to ascertain and determine whether the social, emotional, medical, or educational problems are dominant" often "all of these needs are so intimately intertwined that realistically it is not possible * * * to perform the Solomon-like task of separating them." *North v. Dist. of Columbia Bd. of Ed.*, 471 *F.Supp.* 136, 141 (D.D.C.1979). If a child's handicap requires institutional placement to provide an effective education, a precise diagnosis of the nature of his handicap is irrelevant to the State's obligation under federal law to provide free care. This observation should guide the administrative proceedings ordered by the court.

### Conclusion

For the foregoing reasons, I conclude that the State Constitution and federal law free plaintiffs from at least part of their statutory obligation to reimburse the State for the care and

---

§ 1412(2)(B); 45 *C.F.R.* § 121a.302, which was not effective until 1978. After that date, it would also apply.

education of their children. I would remand both cases before us for an administrative determination of those facts that would support plaintiffs' right to relief. Since the majority finds no such entitlement under our State Constitution, I respectfully dissent.

*For modification and remandment*—Justices SULLIVAN, SCHREIBER, HANDLER and JACOBS—4.

*For reversal*—Justice PASHMAN—1.